**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------×

CHUNG H. CHANG,

        *Plaintiff,*                                  **19-cv-2091**

     *v.*

WARNER BROS. ENTERTAINMENT, INC.,              **COMPLAINT**

        *Defendant.*

-------------------------------------------------------------------------×

       Plaintiff Chung H. Chang ("Chang" or "Plaintiff"), by his counsel, the Law Offices of

Veronica S. Jung PLLC, alleges for his Complaint against Defendant Warner Bros.

Entertainment Inc. ("Warner Bros." or the "Company"), as follows:

## PRELIMINARY STATEMENT

       1.      Chung Chang began working for Dramafever, a digital streaming service

providing Korean and other East-Asian media to Western audiences, in May 2015.  Dramafever

was founded by Korean Americans, and, at the time Plaintiff Chang first joined the company,

Dramafever had a largely Asian American executive class, including Plaintiff Chang, who was

Dramafever's Vice President of Finance.  In 2016, Warner Bros. Entertainment Inc. ("Warner

Bros.") acquired Dramafever.  As part of that transaction, Dramafever became Warner Bros.

Digital Labs ("Digital Labs"), a division of Warner Bros. (collectively the "Company").

       2.      Defendant Warner Bros. Entertainment Inc. ("Warner Bros."), in a blatant act of

racial discrimination, recently terminated *all* of the Asian American executives who worked at

Dramafever, including Plaintiff Chang.  In contrast, upon information and belief, Warner Bros.

retained all of the White executives who had worked for Dramafever.

       3.      When Chang hired an attorney to represent him and notified the Company of his

claim of discrimination, Warner Bros. retaliated against Chang by seeking to falsely blame

Chang for potentially significant legal liabilities which Warner Bros. now faces given the Company's failure to properly license music contained within television shows and movies which were hosted by Digital Labs.  As Vice President of Finance of Digital Labs, Chang was responsible for operating Digital Labs' finance organization.  Chang is not an attorney and had no responsibilities for content licensing.

4.      Upon information and belief, in October 2018, Warner Bros. shut down Digital Labs' Dramafever streaming channel—one that featured Korean and other East-Asian television shows and movies—in order to obscure the scope of Warner Bros.' infringement of the intellectual property rights of countless musicians, composers, artists, and record labels.  Since Warner Bros. suddenly took down *all* of the content from the Dramafever streaming service, music copyright holders are now unable to peruse the Dramafever library to ascertain the extent to which Warner Bros. infringed on their intellectually property rights.

5.      By using the closure of Dramafever to mask its discriminatory conduct, Warner Bros. subsequently terminated every high-level Asian American employee of Dramafever, including Plaintiff Chang, while sparing high-level White employees.

6.      Upon information and belief, Warner Bros. systematically removed Asian Americans from leadership roles in Digital Labs because it viewed those Asian American executives as fundamentally "foreign" and incapable of engaging with Warner Bros.' primarily White executive class.  Chang himself had previously raised concerns with the Company's then-CEO, Patty Hirsch, concerning the manner in which Asian Americans were treated at the Company.

7.      Upon information and belief, Warner Bros. now is hedging that the thousands upon thousands of copyright holders whose rights were infringed on the Dramafever channel will

not notice Warner Bros.' copyright infringement of their work until all applicable statutes of limitations expire.  When those statutes of limitations expire, all copyright holders whose works were infringed by Warner Bros. will be barred from seeking financial relief and vindicating their rights against Warner Bros.

8.     Upon information and belief, Warner Bros. also shut down another of its content platforms, Machinima, on or about January 18, 2019.  After being one of the largest channels on YouTube for over 10 years, Machinima suddenly made all of its video content private, thus preventing members of the public from viewing its content.  Warner Bros. shut down Machinima and scrubbed the internet of all of its content given the concern that much of its content infringed the copyrights of others.  The hundreds of thousands of videos on the Machinima channel has exposed Warner Bros. to potentially unbounded liability should those copyright holders discover that Warner Bros. was infringing their work.

9.     Upon information and belief, issues pertaining to the proper licensing of copyrighted content hosted on the internet and on streaming platforms have been well known by entertainment lawyers, including those at Warner Bros. for decades.  YouTube itself, including its current owner, Google, has been subject to extensive litigation concerning the alleged improper use of copyrighted material in videos hosted on YouTube.   Thus, any effort by Warner Bros. to claim that it did not know or could not have known of extensive copyright infringement on its platforms, including on Machinima and Dramafever, would ring hollow.

10.     Upon information and belief, it is readily known in the entertainment community that, typically, the reason for the sudden removal of videos from YouTube and other platforms is to avoid further copyright exposure.  Instantaneously removing videos, without warning, as Warner Bros. has done, effectively prevents copyright holders from having a final opportunity to

identify any infringing material.  Accordingly, the rationales for the sudden shutdowns of both Dramafever and Machinima are readily apparent.  *See, e.g., On DramaFever and International Distribution Licenses,* available at http://www.8asians.com/2009/01/08/on-dramafever-and-international-distribution-licenses/  (last visited February 25, 2019) ("The blanket reason for deletion usually is copyright infringement."); *Why Machinima DELETED Videos,* available at https://www.youtube.com/watch?v=tqpNgy49PJA (last visited Feb. 25, 2019) (asking why Warner Bros. would remove all Machinima content on a channel with 12 million subscribers because the Company could be earning tens of thousands of dollars per month for doing absolutely nothing through residual advertising income); *id.* (questioning whether all of the intellectual property rights on "all those thousands and thousands of [Machinima] videos" had been properly secured); *id*. (reporting that AT&T, the new owner of Warner Bros., "is scared crapless of old Machinima content that possibly violated people's copyright rights and possibly getting sued about that going to the future").

11.     Upon information and belief, Warner Bros.' discriminatory and illegal actions continued even after Plaintiff Chang's termination.  Upon receiving notice from Plaintiff Chang that he believed Warner Bros.' actions to have been discriminatory, Warner Bros. began conducting a phony "investigation" at the Company.  Furthermore, the Company began manufacturing baseless claims against Plaintiff Chang, falsely suggesting that Chang was responsible for Warner Bros.' copyright infringement.  Warner Bros. has unlawfully threated to bring these and other legal claims against Plaintiff Chang in order to discourage him from raising his legally protected rights.

12.     Upon information and belief, much like other wrongdoers in Hollywood who have sought to hide systematic misconduct, Warner Bros. has sought to shield its discrimination

and its copyright infringement from public view—and from all of the copyright holders whose works have been infringed.  Here, Warner Bros. has sought to compel arbitration of this dispute, seeking to keep legal claims of civil rights violations and violation of copyright laws out of the public eye.

13.     Upon information and belief, on or about June 15, 2018, AT&T Inc. ("AT&T") completed its proposed acquisition of Time Warner Inc.  Warner Bros. was included among the entities that AT&T acquired, given that Warner Bros. was a division of Time Warner Inc.

14.     Upon information and belief, Plaintiff Chang never agreed to arbitrate any disputes with Warner Bros.  Warner Bros.' attempt to hide its wrongdoing reflects an utter failure of corporate responsibility.  If Warner Bros.' efforts to bury this dispute were to be successful, wrongdoers such as Warner Bros. would simply be enabled to repeat their misconduct in the future without ever being held accountable.  Warner Bros.' racial discrimination and retaliation against Plaintiff Chang, along with its attempt to wrongfully blame its copyright infringement on Chang in retaliation against him, is contrary to public policy.

15.     Warner Bros. violated federal and New York City law by discriminating against Plaintiff Chang, and its actions caused him significant harm.  Warner Bros. also retaliated against Plaintiff Chang by threatening him with legal action.  Plaintiff Chang seeks damages and costs against Defendant Warner Bros. for discriminating against him on the basis of his race and national origin in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL") and on account of Warner Bros.' unlawful retaliation against Chang.

16.     Plaintiff Chang, a father and the sole breadwinner for his family, now faces a future where Warner Bros. has made it impossible for him to provide for them.

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

17.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under § 1981.

18.     Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction over Plaintiff's claims, as Plaintiff is a citizen of the State of New York, and Defendant is a corporation organized under the laws of the State of Delaware with its headquarters located in the State of California.

19.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's claims under the New York City Human Rights Law, as these claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

20.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## TRIAL BY JURY

21.     Plaintiff respectfully requests a trial by jury.

## PARTIES

22.     Plaintiff Chang is a resident of the State of New York.

23.     Upon information and belief, at all times relevant hereto, Defendant Warner Bros. was and is a corporation organized under the laws of the State of Delaware with its principal place of business located at 4000 Warner Boulevard, Burbank, CA.  Warner Bros. is an integrated, broad-based entertainment company focusing on the creation, production, distribution, licensing and marketing of a variety of forms of entertainment and their related businesses, including feature film, television and home entertainment production and worldwide

distribution to DVD and Blu-ray, digital distribution, animation, comic books, video games, and product and brand licensing.

## STATEMENT OF FACTS

24.     Plaintiff Chang is a forty-six-year-old Asian American man of Korean descent. Chang was born in the United States and is a citizen of the United States.

25.     Plaintiff Chang has over two decades of experience working in finance and accounting.  His substantial, broad-based experience gives him the ability to build and run finance organizations for major corporations.

26.     Dramafever, a company founded by Korean Americans, was a digital streaming service providing Korean and other East-Asian media to Western audiences.  Dramafever streamed Asian television shows and movies, with a focus on Korean content.

27.     During or about early- to mid-2015, Plaintiff Chang applied for the position of Vice President, Finance, with Dramafever and was hired for that position.  Chang was never offered any equity stake in Dramafever.

28.     Plaintiff Chang began working for Dramafever in May 2015 as Vice President, Finance.  At the time Chang joined Dramafever, most of the executives employed at Dramafever were Asian American.

29.     Upon information and belief, during or about mid-2015, and perhaps even earlier, Warner Bros. was engaged in talks about acquiring Dramafever from Softbank, a Japanese conglomerate that then held a controlling stake in Dramafever.  During or about August 2015, Plaintiff Chang first learned about these ongoing discussions between Warner Bros. and Softbank.

30.     During or about the fall of 2015, Plaintiff Chang began assisting in the due diligence process as part of the potential sale.  Chang was very busy at the time, given that he was still new at Dramafever and getting up to speed as to both Dramafever's then-current and historical accounting practices.  Chang was also building a finance team from scratch and hired two people to join his team in mid- to late-2015.

31.     In February 2016, Warner Bros. acquired Dramafever.  As part of that transaction, Dramafever changed its name to Warner Bros. Digital Labs., a division of Warner Bros.

32.     Digital Labs created the technical backend for Warner Bros.' various media streaming services.  Digital Labs provided support for three primary channels: (a) Dramafever; (b) DC Universe, which streamed Warner Bros. DC Comics properties; and (c) Boomerang, which streamed Turner's older cartoon properties.

33.     During the due diligence process between Warner Bros. and Softbank concerning the potential sale of Dramafever, Plaintiff Chang was never promised any sort of compensation in connection with the proposed sale of Dramafever to Warner Bros.

34.     Plaintiff Chang did not have any equity stake in Dramafever and thus stood to gain nothing from the transaction.  In contrast, several other Dramafever employees were paid millions of dollars as a result of Warner Bros.' acquisition of Dramafever.  In addition, Warner Bros. paid Softbank tens of millions of dollars for Dramafever.

35.     The Warner Bros. executives who worked on the Dramafever acquisition earned significant promotions and were congratulated on what was viewed as an important acquisition so that Warner Bros., a content creator, could enter the direct-to-consumer business.

36.     At the time the acquisition closed, Plaintiff Chang received no equity or bonus in connection with the transaction.  During or about the months following the closing of the

transaction, Seung Bak, Dramafever's co-founder and CEO, negotiated future compensation for Chang and for certain other Dramafever executives.  It was not until over four months after the acquisition closed that Warner Bros. agreed to pay Chang a fixed salary, with no prospect of it being increased through March 31, 2018, along with the payment of certain bonuses in the future if certain conditions were met.

37.     After this acquisition, Plaintiff Chang reported directly to the CEO of Digital Labs and was responsible for the financial operations of Digital Labs as a whole.  Accordingly, Plaintiff Chang's responsibilities as Vice President of Finance extended to all three of the streaming services operated by Digital Labs.

38.     During or about the fourth quarter of 2017, Plaintiff Chang also became responsible for certain operational roles, such as Content, Advertising Operations, and Business Intelligence, as well as oversight of the Digital Labs' office administrators.

39.     At the time of its acquisition, Dramafever's executive class included Suk Park, Dramafever's Co-founder and General Manager; Seung Bak, Dramafever's co-founder and CEO; Hyun Park, Suk's brother and Dramafever's Vice President; Rena Liu, Dramafever's Director of Business Operations and Strategy; Robert Kamphausen, Dramafever's Vice President of Product; David Yoon, Dramafever's Vice President of Design; Yale Wang, Dramafever's Vice President of Marketing; Darrell Herbst, Dramafever's Vice President of Technology; Tim Lee, Dramafever's Director of Content Licensing; Tanaz Mody, Dramafever's Vice President of People Operations; Romanos Fessas, Dramafever's Vice President of Business Strategy; and Plaintiff Chang.

40.     Immediately upon its acquisition of Dramafever, Warner Bros. and its White leadership evinced a discriminatory view of Dramafever's incoming Asian American executives.

41.     For example, at one of the first executive-level meetings following Dramafever's acquisition, a Warner Bros. media executive expressed surprise that the Korean executives did not have accents, stating that it was "amazing" how good their English was.

42.     Those in attendance at this executive-level meeting on behalf of Dramafever included Suk Park, Hyun Park, Rena Liu, and Tim Lee.  These four individuals are of Asian American heritage.

43.     Craig Hunegs and Peter Roth attended on behalf of Warner Bros.  At the close of this meeting, one of these two executives stated that he wanted to give the Asian American attendees a "good American hug."

44.     Ms. Liu, Mr. Lee, and the Park brothers had all lived in the United States for decades, were all highly educated, were all successful employees of major American corporations, and were running a multi-million-dollar company which Warner Bros. had just acquired.  Yet, they were still viewed by Warner Bros. executives as fundamentally foreign.

45.     The Dramafever executives in attendance at this meeting were taken aback and concerned by these comments, and they relayed what was said at the meeting to Plaintiff Chang.

46.     These types of comments illustrate the discriminatory lens through which Warner Bros. viewed Dramafever's minority executives.  Dramafever's Asian American executives were characterized primarily as outsiders and foreign to the existing Warner Bros. establishment.

47.     These comments were particularly concerning, and at least hypocritical in part, because Warner Bros.' CEO, Kevin Tsujihara, is Japanese American.

48.     Warner Bros.' culture of permissiveness allowed discrimination against Asian Americans to go unchecked.  High-level White executives at Warner Bros. made offensive race-

based comments and discriminated against and retaliated against Asian Americans even though they reported to an Asian American CEO.

49.     Plaintiff Chang spoke with several other Asian Americans at the Company who agreed that it was shocking, both that these views existed at Warner Bros. and that they were being expressed so openly.  Chang was taken aback and disturbed that these antiquated comments were being expressed in a professional environment, in this modern day and age.  But Chang told himself that this perhaps is something that still goes on at "old media" companies like Warner Bros.

50.     Warner Bros.' discrimination against Asian Americans extended into its operation of Dramafever and Digital Labs.

51.     Seung Bak resigned as CEO during or about early 2018.  Warner Bros. replaced Mr. Bak with Patty Hirsch, a White woman.  From that point forward, Ms. Hirsch was Plaintiff Chang's direct supervisor.

52.     Ms. Hirsch expressed similar discriminatory sentiments to other White Warner Bros. executives and allowed the discriminatory conduct to continue.  For example, when Plaintiff Chang informed Ms. Hirsch that he was of Korean descent, Ms. Hirsch responded by stating "Oh, you're not Chinese?"  This comment was particularly bizarre and inappropriate, given that Ms. Hirsch was well aware that most of the executives at Dramafever were Korean American and that Dramafever focused on Korean content.

53.     These types of comments made clear, both to Plaintiff Chang and to other Asian American executives at Dramafever, that White executives at Warner Bros. tended to view executives at the Company as either "White" or "not White," and that non-White executives were disfavored.

54.     During or about early 2018, shortly after Ms. Hirsch joined the Company as CEO, Plaintiff Chang made a point to meet with her to express his concerns about the racially discriminatory environment at the Company.  During that conversation, Chang related to her some of the offensive comments made by other Warner Bros. executives.

55.     Plaintiff communicated his concerns about the Company's treatment of Asian Americans to Ms. Hirsch in the hope that she would act to address his concerns.  However, Ms. Hirsch was uncomfortable hearing about Chang's experience and, rather than directly addressing his concerns, she quickly changed the subject and moved on to another topic.

56.     During or about the second quarter of 2018, Ms. Hirsch stripped Chang of a number of his responsibilities, including Content, Ad Operations, Business Intelligence, and his management of the Office Administrators.  Even without these responsibilities, Chang still was fully occupied in his core duties since he was in charge of all finance aspects of Digital Labs.

57.     Ms. Hirsch stated that she stripped Plaintiff Chang of these responsibilities because she wanted to "revisit everything" after taking the reins at Dramafever.  Upon information and belief, however, this was a mere pretext for her discriminatory and retaliatory conduct against Plaintiff Chang.  Notably, for example, she did not take any substantial duties away from White Vice Presidents at Dramafever.

58.     Ms. Hirsch also began excluding Plaintiff Chang from meetings related to personnel decisions, including headcount, hiring, and firing.  This marked a notable change from the past, given that Plaintiff Chang had previously sat in on these meetings during Mr. Bak's tenure as CEO.  Ms. Hirsch and the Human Resources director would also exclude Chang from projects that directly impacted his financial responsibilities; as a result, he would often have to correct their work when he became aware of it later on.

59.     Plaintiff Chang, concerned by Ms. Hirsch's decisions, asked Ms. Hirsch if there was anything he could do differently, but Ms. Hirsch could not identify for Plaintiff Chang any specific performance issue that he needed to address.  In bi-weekly one-on-one meetings between Ms. Hirsch and Plaintiff Chang, Ms. Hirsch never raised any issues with Chang's performance.  By this point Plaintiff Chang had already made his concerns clear to Ms. Hirsch about the mistreatment of Asian Americans at the Company and the fact that he had concerns about how he was treated, as an Asian American himself.

60.     Plaintiff Chang never received a negative performance evaluation or other written criticism of his job performance; to the contrary, Plaintiff Chang earned several salary increases. For example, during or about December 2017, the Company informed Plaintiff Chang that his base salary would be increased by more than 15%.  Upon information and belief, he would not have received these salary increases if his performance had been substandard.

61.     Discrimination at the Company also took the form of reduced expectations and responsibilities for Asian American executives.

62.     Warner Bros.' preference, and Ms. Hirsch's preference, for White executives was clear: Ms. Hirsch repeatedly stated that Warner Bros. wanted "people who could sell" in executive roles.  When Plaintiff Chang asked Ms. Hirsch to explain this statement, Ms. Hirsch identified two White executives, the Vice President of Operations and the Vice President of Product, as people who could "sell."

63.     Plaintiff's primary responsibility was to manage the Company's finances, as his job title and past experience indicated.  Plaintiff Chang knew plenty of individuals who work in finance at Warner Bros. who do not "sell" but who are very successful.

64.     Upon information and belief, what Ms. Hirsch and her fellow executives at Warner Bros. really meant by these comments is that executives should look like they can "sell." They just wanted people in executive leadership who look and sound like they do, and who the Company believed would present better to Studio executives in Burbank.

65.     In other words, Warner Bros. and Ms. Hirsch sought out White executives who were racially and/or ethnically similar to the existing White leadership at the Company in the biased belief that they would be more effective operating within a similar culture.

66.     This view is reflected elsewhere in Warner Bros.' operations.  Warner Bros. staffs its lower level positions in the accounting department with Asians and/or Asian Americans in order to satisfy diversity requirements.  For example, as part of Plaintiff Chang's job duties, he visited Warner Bros.' accounting department which is located in Burbank, California, on a quarterly basis.  During these visits, which occurred as recently as late-2018, plaintiff Chang noticed that many of the low-level employees in the accounting department were Asians and/or Asian Americans.  In contrast, the majority of the executives in Warner Bros.' accounting department in Burbank, California were White.

67.     Like all major corporations, Warner Bros. has a number of diversity initiatives relating to its employment practices in a claimed effort to increase diversity.  Despite this, and even though it has some Asian American leadership, including its CEO Kevin Tsujihara, the majority of executives at Warner Bros. are White.  Discrimination against non-Whites at the Executive levels was particularly prevalent at Digital Labs in connection with Plaintiff Chang's termination and the termination of other Asian American executives, as Plaintiff Chang describes in detail here.

-14-

68.     Warner Bros.' discriminatory intent manifested most clearly when the Company decided to close Dramafever in mid-October 2018.

69.     As part of the process of closing Dramafever, Ms. Hirsch determined which employees to terminate and which to retain in Digital Labs.

70.     Ms. Hirsch's decision on which employees to terminate was not driven solely by Warner Bros.' business decision to close Dramafever; rather, it was impermissibly tainted by race and national origin.  In other words, Ms. Hirsch and the Company used the closure of Dramafever as an excuse to terminate a number of Asian American executives from Digital Labs.

71.     Rather than terminating the employees who worked in positions entirely dedicated to Dramafever, Ms. Hirsch chose to terminate only certain dedicated Dramafever employees while transferring others to Digital Labs.

72.     Additionally, as part of the closure, Ms. Hirsch decided to terminate Digital Labs employees who had responsibilities which encompassed streaming services other than Dramafever.

73.     Of the seven Vice President-level employees listed as part of Dramafever, there were three Asian Americans and four Whites.  Ms. Hirsch, and Warner Bros., decided to terminate all three Asian Americans; in contrast, they chose to retain all four Whites.  Ms. Hirsch and Warner Bros. also terminated the sole Executive Director, Tim Lee, who is also Asian American.

74.     Warner Bros. elected to terminate Plaintiff Chang as part of this process, despite the fact that Plaintiff Chang oversaw the financial operations of Digital Labs and all of its divisions, not just Dramafever.

75.     In fact, as an internal accounting matter, the cost of Plaintiff Chang's employment was not assigned to Dramafever.  Dramafever had its own P&L, and he was not factored into Dramafever's P&L.  The cost of Plaintiff's employment was listed on Digital Labs' P&L, given that his work as Vice President of Finance spanned all of Digital Labs' operations.  The closing of Dramafever would not have adversely impacted Plaintiff's ability to be productive, nor would it have adversely impacted his team's operations.

76.     Every senior-level employee terminated at about this time was Asian American. All three Vice Presidents, including Plaintiff Chang, who were terminated were Asian American. Ms. Hirsch also terminated the sole Executive Director, Tim Lee, who is also Asian American. All four Asian Americans, including Plaintiff Chang, were terminated on the same day.

77.     Warner Bros. did not terminate any of Plaintiff Chang's direct reports, and, upon information and belief, the finance team that he supervised is still largely intact.

78.     At all relevant times, including at the time of Plaintiff's termination, Warner Bros. did not provide Chang with the opportunity to seek other positions within the Company. The Company simply terminated him, even though there were many other positions in Warner Bros. where Chang's financial and other experience could be readily employed.

79.     In contrast, when Warner Bros. recently shut down another of its networks, Machinima, it allowed a White female executive that ran the network to remain employed while she pursued other opportunities.  In contrast, Warner Bros. simply terminated Plaintiff Chang, even though he could have both continued his work as Vice President of Finance of Digital Labs, taken on other responsibilities within Digital Labs, or pursued opportunities elsewhere at Warner Bros.  This further demonstrates the Company's discriminatory motives in its decision to terminate Plaintiff Chang and its unlawful retaliation against him.

-16-

80.     After being terminated, Plaintiff Chang retained counsel who then contacted Warner Bros. to put the Company on notice that Plaintiff Chang believed Warner Bros.' actions to be discriminatory.

81.     In response, months after Plaintiff Chang's termination and for the first time, Warner Bros. stated that it had identified its own claims against Plaintiff Chang and that it would pursue them if Plaintiff Chang filed suit against Warner Bros.

82.     Upon information and belief, these purported claims arise out of an ongoing legal issue based on music licensing for the media properties streamed on Dramafever.

83.     While employed by Dramafever, Plaintiff Chang had no role in assessing legal issues in general or the question of music licensing in particular.

84.     As part of the due diligence process in 2015, Plaintiff Chang learned that Dramafever had prior expenses related to music licensing claims.

85.     In general, the issue concerning music licensing and copyright infringement pertains to music that may be embedded within content, such as international television programs, streamed on Dramafever.  Upon information and belief, even though Dramafever paid to license the television programs themselves that were streamed on the Dramafever platform, the production company/content owner of certain of those television programs may not have either properly licensed or obtained permission to use certain copyrighted musical works contained within those television programs.  In that event, a copyright holder to the musical work may contend that Dramafever has infringed its rights and subject Dramafever to liability.

86.     Information about music licensing liabilities was well known to Dramafever's other executives, Softbank, and, upon information and belief, Warner Bros., at the time of Warner Bros.' acquisition of Dramafever.  Furthermore, upon information and belief, during or

about early 2016, several Dramafever executives met with Warner Bros.' legal counsel concerning potential music rights liabilities.

87.     In the process of investigating one transaction at Warner Bros.' request during the due diligence process—which was either a payment to an attorney in connection with a musical work copyright claim or a settlement payment for a musical work copyright claim—Chang reported the purpose of the transaction to Anna Lo, a Softbank employee who regularly interacted with Dramafever representatives.

88.     Plaintiff Chang had a limited role in the process of Warner Bros.' acquisition of Dramafever and had no responsibility for the issue of music rights.  At the time of the acquisition, Plaintiff Chang was still a relatively new employee given that he joined Dramafever in May 2015 and the acquisition was agreed to by February 2016.  Furthermore, Chang's duties, as Vice President of Finance of Digital Labs, was to operate its finance organization; he is not an attorney and had no responsibilities for content licensing.

89.     Upon information and belief, in October 2018, Warner Bros. shut down Digital Labs' Dramafever streaming channel—one that featured Korean and other East-Asian television shows and movies—in order to obscure the scope of Warner Bros.' infringement of the intellectual property rights of countless musicians, composers, artists, and record labels.  Since Warner Bros. suddenly took down *all* of the content from the Dramafever streaming service, music copyright holders are now unable to peruse the Dramafever library to ascertain the extent to which Warner Bros. infringed on their intellectually property rights.

90.     Now, upon information and belief, Warner Bros. is simply hoping that the thousands upon thousands of copyright holders whose rights were infringed on the Dramafever channel will not notice Warner Bros.' copyright infringement of their work until all applicable

statutes of limitations expire.  When those statutes of limitations expire, all copyright holders whose works were infringed by Warner Bros. will be barred seeking financial relief and vindicating their rights against Warner Bros.

91.     Upon information and belief, issues pertaining to the proper licensing of copyrighted content hosted on the internet and on streaming platforms have been well known by entertainment lawyers, including those at Warner Bros. for decades.  YouTube itself, including its current owner, Google, has been subject to extensive litigation concerning the alleged improper use of copyrighted material in videos hosted on YouTube.   Thus, any effort by Warner Bros. to claim that it did not know or could not have known of extensive copyright infringement on its platforms, including on Machinima and Dramafever, would ring hollow.

92.     From the time Warner Bros. acquired Dramafever in 2016 through the end of Plaintiff Chang's employment in October 2018, the Company never communicated to Plaintiff Chang that it believed he bore any responsibility for the ongoing music licensing issues, which were well-known within Dramafever.

93.     Nonetheless, Plaintiff Chang learned that, after he put Warner Bros. on notice of his claims of unlawful discrimination and retaliation, Warner Bros. began interviewing Plaintiff Chang's former colleagues in a misguided attempt to further retaliate against Chang by blaming music copyright liability issues on Chang.

94.     Warner Bros. brought these individuals into interviews under false pretenses. These interviews were not held at the Company's offices.  Instead, these interviews were held at the law offices of Dontzin Nagy & Fleissig LLP.  Unbeknownst to the interviewees, Dontzin Nagy & Fleissig LLP is the same law firm that is adverse to Plaintiff Chang, and representing Warner Bros., in this dispute between Chang and Warner Bros.  The attorneys present at these

interviews from Dontzin Nagy & Fleissig LLP and Warner Bros. then proceeded to interrogate the interviewees about Plaintiff Chang.  Upon information and belief, the purpose of these interviews was for Warner Bros. to build an unsubstantiated legal case against Chang.

95.     Upon information and belief, some of the interviewees were extremely troubled by Warner Bros.' outside counsel's insinuation that Plaintiff Chang had done anything inappropriate.  After the interviews, some of the interviewees contacted Plaintiff Chang, on their own volition, and informed him of the Company's "investigation."

96.     Since that time, Warner Bros. has persisted in its campaign against Plaintiff Chang in an effort to dissuade him from asserting his rights and filing legal claims against the Company.

97.     Upon information and belief, Warner Bros. has asserted to former executives of Dramafever that Plaintiff Chang had acted inappropriately or otherwise faced liability for the Dramafever music rights issue.  By spreading harmful and false rumors about Plaintiff Chang's integrity and conduct as Vice President of Finance, Warner Bros. has interfered and impeded with Plaintiff's ability to secure employment.

98.     Warner Bros. pursued this strategy specifically because Plaintiff Chang raised claims of discrimination, in order to dissuade Plaintiff Chang from filing a lawsuit against Warner Bros.

99.     Upon information and belief, on or about June 15, 2018, AT&T completed its proposed acquisition of Time Warner Inc.  Warner Bros. was included among the entities that AT&T acquired, given that Warner Bros. was a division of Time Warner Inc.  Accordingly, AT&T is now Warner Bros.' ultimate corporate parent.

100.     Upon information and belief, at all relevant times in the dispute concerning plaintiff Chang's employment and termination, decisions concerning Warner Bros.' legal strategy were made by members of Warner Bros.' legal department and Warner Bros.' executives, not by employees of AT&T.

101.     Plaintiff Chang is a father and the sole breadwinner for his family.  None of his family members, including his children, currently have health insurance.  Plaintiff now faces a future in which Warner Bros. has made it impossible for him to provide for them. Plaintiff Chang recently purchased a house and now must use emergency savings to pay his bills.

102.     Warner Bros.' retaliation has caused Plaintiff undue anxiety and stress.  Since his termination, and particularly since Warner Bros. began threatening him with litigation, Plaintiff Chang has become increasingly moody, depressed, and anxious.  Plaintiff now has insomnia and is having difficulties sleeping at night.  Plaintiff Chang has an extremely reduced appetite, to the point at which he often does not even feel like eating anymore.  Plaintiff has continued to lose weight since his termination.  And after Chang first learned of Warner Bros.' latest retaliatory and false accusations against him, he lost five pounds in several days alone.  His level of stress has gotten so severe to the point that it is even affecting his dental health; on one occasion, pieces of his teeth began falling off.  The intense stress he is experiencing is also impacting his relationship with his children.  Even when Plaintiff is with them, the only thing he can think about is Warner Bros. and its continued efforts to malign his professional reputation.

103.     The realization that Plaintiff Chang is up against a global corporation and media giant, and that Warner Bros. apparently will go to any lengths to defend itself—and act as if rules of decency and fairness do not apply—keeps him up at night.  Plaintiff Chang is fearful for himself and for his family.

104.     Plaintiff Chang's wife is worried, given the retaliatory actions already taken by the Company.  Plaintiff is going on job interviews and is fearful that word of Warner Bros.' false claims against him will get out to the close-knit media industry.  Individuals in this industry know each other, and even competitors are "frenemies."  Plaintiff believes that, given that Warner Bros. already has taken the extraordinary step of fabricating claims against him which could destroy his career, Plaintiff does not see why the Company would stop there.  For example, Plaintiff could very well imagine a scenario where decision makers at Warner Bros. decide to pick up the phone and call their counterparts at competing media companies, and spread false accusations to further retaliate against him.

105.     While the discrimination and retaliation Plaintiff Chang faced at work were both upsetting and distressful, Warner Bros.' tactics over the past two months have magnified Plaintiff's stress.  Plaintiff Chang is fearful that their actions will cost him his entire career.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Race Discrimination in Violation of § 1981

106.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 105 with the same force as though separately alleged herein.

107.     Section 1981 prohibits discrimination in contract, such as employment, on the basis of race.

108.     Warner Bros. discriminated against Plaintiff Chang on the basis of his race by taking adverse employment action against him.

109.     As such, Warner Bros. has violated Section 1981.

110.    As a direct and proximate consequence of Warner Bros.' discrimination, Plaintiff Chang has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

111.    Warner Bros.' discriminatory treatment of Plaintiff Chang was willful and/or in reckless disregard of Plaintiff Chang's protected rights.  Accordingly, Plaintiff Chang is entitled to an award of punitive damages against Warner Bros.

### SECOND CAUSE OF ACTION

### Retaliation in Violation of § 1981

112.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 111 with the same force as though separately alleged herein.

113.    Section 1981 prohibits retaliation against individuals who assert their rights under Section 1981.

114.    Plaintiff Chang asserted his rights under Section 1981 when he put the Company on notice that it had discriminated against him on the basis of his race.

115.    Warner Bros. retaliated against Plaintiff Chang after he raised concerns with the Company's then-CEO, Patty Hirsch, concerning the manner in which Asian Americans were treated at the Company.  Ms. Hirsch subsequently stripped Chang of many of his work responsibilities and ultimately terminated him.

116.    Warner Bros. further retaliated against Plaintiff Chang by threatening to take legal action against him if he chose to assert and pursue his legal claims against the Company for discrimination and unlawful retaliation.  In fact, Warner Bros.' outside counsel explicitly stated to Plaintiff Chang's counsel, in writing, that if Chang proceeds with legal claims against Warner Bros., Warner Bros. would respond by pursuing unspecified legal claims against Chang.

117.     Warner Bros. further retaliated against Plaintiff Chang by fraudulently inducing Chang's legal counsel to attend an all-day JAMS mediation concerning this dispute.

118.     This premediated stunt by Warner Bros. caused Plaintiff Chang's attorneys to waste at least sixteen (16) hours of their time in this meaningless and unproductive mediation session.

119.     In further unlawful retaliation against Chang, Warner Bros.' attorneys violated JAMS rules by improperly utilizing confidential information obtained in mediation.  In addition, Warner Bros. attorneys have leveled factually baseless accusations of ethics violations against Plaintiff Chang's counsel in a transparent attempt to further dissuade Plaintiff Chang from filing his civil rights claims in federal court.

120.     Warner Bros.' willful misrepresentations and bad faith actions induced Chang's attorneys to delay the filing of this lawsuit for nearly two-and-a-half months.

121.     As a direct and proximate consequence of Warner Bros.' discrimination, Plaintiff Chang has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

122.     Warner Bros.' retaliation against Plaintiff Chang was willful and/or in reckless disregard of Plaintiff Chang's protected legal rights.  Accordingly, Plaintiff Chang is entitled to an award of punitive damages against Warner Bros.

## THIRD CAUSE OF ACTION

### Discrimination in Violation of the New York City Human Rights Law

123.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 122 with the same force as though separately alleged herein.

124.     The New York City Human Rights Law ("NYCHRL") prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of, *inter alia*, their race and national origin.

125.     Warner Bros. is an employer as contemplated by NYCHRL, and Plaintiff Chang is an employee as contemplated by the NYCHRL.

126.     Warner Bros. discriminated against Plaintiff Chang on the basis of his race and national origin, by taking adverse employment action against him, up to and including terminating his employment.

127.     As such, Warner Bros. has violated the NYCHRL.

128.     As a direct and proximate consequence of Warner Bros.' discrimination, Plaintiff Chang has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

129.     Warner Bros.' discriminatory treatment of Plaintiff Chang was willful and/or in reckless disregard of Plaintiff Chang's protected legal rights.  Accordingly, Plaintiff Chang is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION

### Retaliation in Violation of the New York City Human Rights Law

130.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 129 with the same force as though separately alleged herein.

131.     The New York City Human Rights Law ("NYCHRL") prohibits an employer from retaliating against an employee for asserting their rights under the NYCHRL.

132.     Warner Bros. is an employer as contemplated by NYCHRL, and Plaintiff Chang is an employee as contemplated by the NYCHRL.

133.   Plaintiff Chang asserted his rights under the NYCHRL when he notified the Company that it discriminated and retaliated against him on the basis of his race and ethnicity.

134.   Warner Bros. retaliated against Plaintiff Chang after he raised concerns with the Company's then-CEO, Patty Hirsch, concerning the manner in which Asian Americans were treated at the Company.  Ms. Hirsch subsequently stripped Chang of many of his work responsibilities and ultimately terminated him.

135.   Warner Bros. further retaliated against Plaintiff Chang by threatening to take legal action against him if he chose to assert and pursue his legal claims against the Company for discrimination and unlawful retaliation.  In fact, Warner Bros.' outside counsel explicitly stated to Plaintiff Chang's counsel, in writing, that if Chang proceeds with legal claims against Warner Bros., Warner Bros. would respond by pursuing unspecified legal claims against Chang.

136.   Warner Bros. further retaliated against Plaintiff Chang by fraudulently inducing two of Chang's attorneys to attend an all-day JAMS mediation concerning this dispute.

137.   This premediated stunt by Warner Bros. caused Plaintiff Chang's attorneys to waste at least sixteen (16) hours of their time in this meaningless and unproductive mediation session.

138.   In further unlawful retaliation against Chang, Warner Bros.' attorneys violated JAMS rules by improperly utilizing confidential information obtained in mediation.  In addition, Warner Bros. attorneys have leveled factually baseless accusations of ethics violations against Plaintiff Chang's counsel in a transparent attempt to further dissuade Plaintiff Chang from filing his civil rights claims in federal court.

139.   Warner Bros.' willful misrepresentations and bad faith actions induced Chang's attorneys to delay the filing of this lawsuit for over two months.

140.   As such, Warner Bros. has violated the NYCHRL.

141.   As a direct and proximate consequence of Warner Bros.' retaliation, Plaintiff Chang has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

142.   Warner Bros.' retaliation against Plaintiff Chang was willful and/or in reckless disregard of Plaintiff Chang's protected legal rights.  Accordingly, Plaintiff Chang is entitled to an award of punitive damages.

## <u>REQUEST FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  For the first cause of action, damages to be determined at trial;

B.  For the second cause of action, damages to be determined at trial;

C.  For the third cause of action, damages to be determined at trial;

D.  For the fourth cause of action, damages to be determined at trial;

Dated: March 6, 2019
      New York, NY

Respectfully submitted,

_____/s Veronica S. Jung_____
Veronica S. Jung, Esq.
Aaron S. Foldenauer, Esq.
Owen H. Laird, Esq.
LAW OFFICES OF VERONICA S. JUNG, PLLC
200 Park Avenue, Suite 1700
New York, NY 10166
Telephone: (212) 897-1981
Email: vjung@veronicajunglaw.com
Email: afoldenauer@veronicajunglaw.com
Email: olaird@veronicajunglaw.com

*Attorneys for Plaintiff Chung H. Chang*